Case No. 08-2513, consultation phase 08-2515. Tracy Pollo et al. v. Dean Foods Co. Good morning, Your Honors. My name is Jim Forsman. I represent three of the defendant's appellants, Alko Wisconsin, Alder Group, and Jamie Reeves. Hugh Griffin for the defendant's appellant, Dean Foods Co. Good morning, Your Honors. Michael Rastak, I'm here on behalf of the plaintiff's affiliate, Alexander Jacones. My help for the other partner case, Mark McNeil, Your Honors. I'm representing the state's civil case. Thank you, gentlemen. You've very carefully allocated your briefs so that you don't unduly duplicate each other's efforts, and I would imagine you would do the same with your oral arguments. Right, precisely. So why don't you proceed as the appellant when you're ready. Thank you, Your Honors. Our intention on the appellant's side is to split the time evenly. If I get into the area where Mr. Griffin is going to be shortchanged, I don't feel comfortable to sit down. Well, presumably, we're not going to spend a lot of time, and we're not going to be looking at this thing with a magnifying glass. Presumably, you'll do those areas that you feel you ought to press, and you'll rely on the proven expertise of your associate to handle the other area. Yes. May I please report? Before you start, I'd like to know about standing. How do all the defendants have standing? Judgment was entered against Jamie Reeves, Alder Group, Alcove Wisconsin, and Dean Foods Company. And those are the four appellants. You're going to address the SOJ motion first, are you? Yes, sir. I'm talking about standing on the SOJ motion. Go ahead. Okay. I'll address that more fully. These judgments are burdened by several errors that require reversal. The first and probably most obvious one is the trial court's denial of Alder Group's motion for substitution of judge as of right. Plaintiffs sued six defendants initially. When the case came up for trial, there were a series of changes of judge. First, Dean, Illinois Dairies, took a change from Judge Haddon. Second, Alcove Wisconsin took a change from Judge Zwicky. Third, Dean Foods Company took a change from Judge Varga. And fourth, Alcove Inc. took a change from Judge Bass. Did this all occur within a series of just a few days? Yes. All the SOJs? Yes. Did you have any part of the record as to how this was orchestrated among the defendants, whether each one pursued an individual preference, or whether there was any kind of agreement as to what would happen here in terms of SOJs? There is no evidence of any agreement. No part of the record. Okay. All the defendants were represented by the same defense attorneys. Let me ask you one other thing. Would you agree then that since this happened after the case was signed for trial, and it was within a few days that all the defendants were making their respective motions for change, that this wasn't some sort of delay of trial? A collusive tactic designed to delay? No. No evidence of that. All right. So that argument could be thrown out. It's not considered any further. It moves along pretty quickly. The day after Alcove Inc. takes a change from Judge Banks, the plaintiffs present a motion to reconsider that. Judge Banks holds a hearing on the motion to reconsider, and she asks defense counsel, what's your position on that? Defense counsel agrees. He says, I think that the motion to reconsider is well-founded, although the plaintiffs seem better. So it was basically an agreed order from which inferences could not be drawn as to the judge's liens. Correct. Correct. Defense counsel agreed that the motion to reconsider was well-taken. That doesn't mean that it's totally not substantial, does it? Well, I think the SOJ is a matter of right. You don't think it can be a substantial ruling, even if the party on the other side says, you know, we agree? That's part of the reason I think it's not a ruling on a substantial issue. It's undisputed. There is nothing for the judge to do other than to acquiesce to the agreement. There was no dispute. There was no issue to be decided. Defense counsel said, you're right. Plaintiff's right. Both Alco Wisconsin and Alco Inc. are essentially the same entity, changed names over the years. Plaintiffs sued both, but we agree. And in the same breath, defense counsel said, so, I now present a motion for change on behalf of all the groups. At this point in the proceedings, two of the defendants still had a change. Jamie Reeves hadn't used his. All the groups hadn't used his. Now, why should we, we're coming down to the $64 question, which states, may I lift out all the zeros. Why should we necessarily agree with Justice Myerscott and reject Justice Steigman in determining the issue of standing? Why should the other defendants have, in plain language of beef, about the fact that the trial judge did not honor the SOJ of two of the parties, motion for two of the parties, which the plaintiffs have indicated a willingness to drop because evidently the pockets are deep enough in the remaining parties. Well, the plaintiffs have relied on the off-seeker case authored by Justice Steigman. There's a lot of reasons why this court shouldn't follow off-seeker. First of all, there was no legal rationale in the opinion. Yes, but the rationale is the intuitive one, namely, no one's ox is being gored. Any kind of determination that takes and plants the words of the Stoler case that the other rulings are a novelty to have a kind of a universal application is doing so without any rational predicate other than the policy one advocated by Justice Myerscott that you don't want conflicting decisions. Well, that's a weighty consideration in itself. You end up with the possibility of inconsistent decisions on the same issue where defendants have similar issues. But why should the fact that a judge violates the rights of one party be available as a defense to the other parties whose ox is not being gored by that decision? They're without any kind of prejudice. So granted, a judge who overstays his welcome when he's given the 1001 absolute right to an SOJ can't write orders for that party. If he does or she does, it's a novelty. But why should the others be able to capitalize on it? Well, I think the first and clearest answer is the statute says so. Where is the statute? 2-1001C says when the motion is granted, the case gets assigned. Not bits and pieces. You don't cut it out. Because it contemplates a single party. It doesn't contemplate multiple parties. I don't think there's any support for that. Because what reason dictates that? Statutes, after all, do not evolve by themselves. They require the initiative of rational people. What would be the assembly, lawyers among them, feel the need for it? When the statute has an application, that doesn't make sense. It doesn't and shouldn't last very long. But if you can read it so that it makes sense, then maybe we're obligated to do so. But it does make sense. If you don't, after a wrongful denial of one of these SRJ motions as of right, if you only give the benefit of that, if you only reassign part of the case, then you potentially have multiple different cases being tried. There's even an answer to that because those cases can subsequently be consolidated. That's the answer that your opponents apply. I'm not sure I'm terribly overly impressed with that answer, but that is a fact. It doesn't end. The problem with consolidating it is that it only gives nominal value to the motion in the first place because you might be getting stuck with the same judge. But it could be consolidated with the next judge. It's a consideration that influenced the fourth district, obviously, in Austin. Those cases were perhaps actually significant in terms of why the different panels ruled the way they did. But do you have any Illinois Supreme Court case that you think gives us guidance on this question about this very situation involving the plaintiffs versus the multiple defendants here? All you have is dominant judge, and that doesn't deal with that. Dominant judge gives you a lot of the general background. But the point behind granting a change as of right when that's violated, the reason that the orders are void or nullity subsequent to that, what do you believe the reasoning behind that is? I believe the reasoning is pro-flat. I think the reasoning is that this is something that it's a serious rule, that there's no way around it. The trial judge acts in verification of the statute and doesn't have the power to hear the case when that statute is violated. And when the court doesn't have the power to hear the case, the orders entered subsequent, according to cases going back more than 100 years, is that those orders are void. So I'm just asking, do you have any Supreme Court case that you think would give us further guidance on whether or not her hearing any more of that... And they're both excellent judges, incidentally. Justice Niasca and Justice Steinberg. Their views are not to be sneezed at. Sure, but it's also true. In our secret, there was no legal authority cited. You do get the general background from Dominique F. that states that the right is absolute, that subsequent orders are void. There's no further explanation that I've seen in the Supreme Court opinions about what the reason for that is other than the intuitive one, and that this is really a serious matter. There's no fooling around about it. A change of right means a change of right. But there's other issues here. Was this a substantial ruling? You're saying that a ruling on a substitution of judge is de facto not substantial? I mean, I don't know that that's a given of any kind. And does it matter that when that ruling was, when the motion to reconsider came up, the ruling denying the substitution had occurred the day before, correct? The denial of the motion for substitution occurred the day before then. There was a motion to reconsider. But at the same time, the parties have put in this little excerpt from the transcript where the court, where one of the defendants says, but I also have a, I have a substitution regarding Alder at the same time. Does it matter that this, whether this ruling about the reconsideration occurred after the request was made for this other substitution? Once that substitution was made, is there somehow, suddenly, the court has to drop everything and then rule on the substitution before it rules on the motion to reconsider? Yeah, I think it's all about time. I think the statute is there. I think the Supreme Court address is there. Don, look at it. You can't take a motion for substitution and then intervene with a substantive one so that you can knock off the SOJ by saying it's too late. You have to take it in the order that it's presented, which is not entirely accurate, is it? Because what if the SOJ motion is filed before there's a ruling on a summary judgment motion? There's case law on that, too, that says you take the SOJ first, even though it's filed second, so that there's a preeminence in determining the SOJ before you do anything else. That's what the rule seems to be. I think there's a case with Judge Garcia where he said that, even though the summary judgment motion was filed first before the SOJ, since it wasn't ruled on, the SOJ should go first. And the tendency of the summary judgment motion will not be enough to nullify or to displace the 1001 requirement. Right. The way I read it, Dominique Depp supports that. When the motion for SOJ is presented, everything else stops. The court has to address that motion first. But even if it's not raised, even if it's not presented first, if it's in the offing before any substantive decision is made. So in that sense, do we really care, in your case, whether the motion was actually presented or whether it was – did anything occur before the motion was presented or was there another intervening motion presented? Do you follow me? I don't know if I'm making myself clear. In your case, there's a sub-issue. Namely, did you, in fact, present your motion first, since all you did, your opponents say, is indicate that you had one, before there was actually a substantive ruling in the case. Now, was there a substantive ruling before you formally filed that motion? No. There was no ruling. No ruling of any kind. So it doesn't really matter which was first. As long as there was no ruling of substance pending when there was a ruling on the SOJ. That's what I thought. The point. I'd like to get back to the offing for a minute. You talked about reasons why you shouldn't follow that. You know, although Judge Steigman found that the other defendants didn't have standing to raise the issue, the court never looked at what is the rule to determine the standing of parties. Didn't even consider it. Under the ordinary rule of standing, they would have standing. They have a substantial immediate interest that's disadvantaged by the ruling. They don't have standing if, in fact, I mean, if you determine that the ruling only affects the validity of the judge's order with regard to the party whose SOJ is being ignored. Then they really have no standing. They have no interest. Because the case will proceed as against them anyway, and they're not in any way prejudiced by what the judge does, except in a kind of remote fashion that probably doesn't count as prejudice. Well, except that all the law for the last hundred years has said when such a motion is wrongfully denied, all the orders and judgments in the case are void. Well, no case has said that except for Austin v. Because no case specifically dealt with the question of multiple parties. There may have been one case that dealt with multiple plaintiffs, but there's been no case dealing with multiple defendants. Whether the rulings of the court will stand up as against the non-movement defendants. This is the first one, outside of Austin v. You're right about that. Otherwise, you wouldn't be citing that Garoppolo case, which has only a CF kind of relevance. The question was raised by Justice McBride as to whether a substantial issue had been decided. It's our position no issue was decided. But beyond that, it's not a substantial issue because it was agreed. But beyond that, it's not a substantial issue because both sides agreed that you don't have a substantial issue unless you have a ruling that goes to the merits. This ruling only went to what judge is going to preside over the trial. Plaintiffs have said, well, that's very important because that's the decision-maker. The case is set for a jury trial. This judge is not going to be the decision-maker. Where do you want to go from here in your argument? Is that it for you or do you want to go beyond that? Because I think the clock is, I can't ignore the clock. I believe reference has been made in the brief to the Gagliardo case, and there's several reasons why that just doesn't come in here. It's in a state case. The Quinlan firm that had the time. Well, I guess it's an analogy. It's not directly on court. Well, and the court ended up dismissing the appeal, so it's not even precedential. Was that the case where the judge simply nullified the rulings on attorney's fees? There's another case that did that. I think Zuzinski was contemplating that. Yeah, the Quinlan firm has been paid. The trial judge said, we're going to bring him in as an interested person. An interested person is not a party, quote, party within the meaning of the standard or substitution of judge statute. And the court, the appellate court, determined that the claim of the law firm was ancillary and not part of the case within the meaning of the change of judge statute. That's as far as I can go on that. I'd like to address legal causation. Fine. Second, independent reasons for reversal of the judgment. The point is that the actions of Reeves, the driver, even if negligent, even if cause and fact of the legal causation. You know, you have an interesting question that I don't mind, that you will encounter in your very next argument. Because if you're right on the SOJ, all you get out of it is a remand. And if you're right on the legal causation, you get a reversal with no remand. Interesting question. Maybe. The evidence is insufficient. And you don't get a remand. You get a reversal. On the other hand, if we go with the SOJ, you get a remand. Yeah. It's an interesting issue. You spend a lot of time and money retrying a case. Maybe. But maybe not. This isn't something we've argued, but now that you bring it up, Rule 366 authorizes or permits us to adjust our ruling, to do anything, to make any ruling that ought to have been made below. Now, if the trial court erroneously denies the substitution of judge motions, everything after that is no longer intact. So this overgives all of their instead. Well, but that's the point. Because there were several rulings before Judge Banks ruled on that substitution of judgment. But not before trial. Yeah, before trial. No, but not after trial. Not after trial. There was a motion for summary judgment. You're not going to get an outright reversal on the pretrial rulings, even if they're erroneous, are you? You only stand to get that if you go to trial and there's insufficient evidence. Well, I don't know. If the court finds that we're correct on the legal causation issue, this issue was raised in a pretrial motion for summary judgment. I think this court could, finding that there was error in denying the substitution of judge motions, it at least has to go back that there's no non-entitlement. You're not entitled to a ruling on a denial of a motion for summary judgment. That's not a final argument. Granted. There's no finality. Again, I'm just trying to respond to your question. You might have to think about that for a moment. Rule 366, I think, would allow you to do that. Nice try. Thank you, Eric. Legal causation requires the plaintiff to prove that we have an accident of a type that a reasonable person would anticipate as being likely produced by its negligence. The facts, the basic facts here are not in dispute. Well, I'm not sure about that. In this case, I invite you to give me the specific undisputed facts as to where was Chaconus, where was the truck, where was the automobile, what was actually seen, what is presumed to have been seen, and to what effect does the speed of the vehicle interfere with the events outside of the mere fact that, but not for that speed, the two vehicles wouldn't be at the same place at the same time, which comes close to Gaumont, the old condition versus cause kind of economy. But what was it here? What was actually seen by the driver under the evidence in this case? And what was seen? Did the speed make a difference in what remedial action could have been taken once the entry was made? And to what extent does the speed affect whether the entry into the intersection would have been avoided or better estimated but for that speed? Because one of the arguments is that there was an estimate based on misreading of the actual speed and the presumption that it was the legal speed, and that consequently that the plaintiff felt that it was a safe entry. Would that have been a safe entry? Do we speculate as to whether it would be? I'm giving you an indication of where I want some guidance. Okay. And careful guidance, because your opponents, I would expect them, will pounce on you here. Most of those questions go to negligence or cause and effect. The basic facts that go to the issue of legal causation are much, much simpler. It's undisputed that Ms. Tufonis was stopped at a stop sign on Lincoln, the cross street. It's undisputed that Jamie Reeves was driving his truck on the highway, the preferential highway 30. It's undisputed that Reeves' truck is nighttime. It's undisputed that his truck is likely lit up. Plaintiff's evidence showed that Reeves may have been driving as much as nine and a half miles over the limit, which, for all intents and purposes, let's call that a fact, because that's not something we could change on review, as long as it's an evidence. And I'm assuming that, for purposes of this argument, I'm assuming all of that to be true. And they had experts testify that Reeves was negligent in his speed, in his failure to look out, in driving too tired, in not braking soon enough. They had expert testimony to support all of that. That goes to negligence in causal fact. The question is formulated on how does fatigue and not keeping a proper lookout bear on cause and effect? Doesn't that go directly to the duty aspect of it, to foreseeability, the proximate cause? The only thing that goes to cause and effect is the speed, and I'm wondering whether it's simply restricted to a cause and effect issue. To be cause and effect, the argument has to be, look, if you weren't going at 59 and a half miles an hour, the plaintiff, even if negligently entering the intersection, wouldn't have been hit because you wouldn't have been there. You would have either passed or been somewhere else. And frankly, that's the weakest of arguments to me. I'm not bottom-lining it, but I would be surprised if that were anything other than a Gallman type of non-foreseeability situation. I don't know that yet. I haven't heard full argument on it yet. But if the speed, in addition to determining the coincidence of the fact that they were both sharing the same mathematical plane, geographical plane at a given time, if it were more than that, if it actually impacted on judgment or on behavior at the time, then you're dealing with a closer question about a proximate cause. And your opponents have, I think in their brief, tried to play both aspects of it, both the cause and effect aspect, and also attempted to show how that could have affected behavior and that could have been a contributing factor leading to the collision, other than the fact that it put them both there at the same time. Because if it's a matter of putting them both there at the same time, then the argument could be made that that could have happened if they went too slow. You know, what determines where somebody would, that's pure coincidence. And it may not at all partake of foreseeability. But on the other hand, did the speed impact on when she enters the intersection because she's thrown off her judgment? Or if there is a failure to maintain a proper lookout by having to anticipate, you know, entry into the intersection. You can show that as being a duty. I submit that's probably upheld. But that's where I want you to give me the factors that you see and the factors that exist in the record that may affect interaction between the parties based on the relative, on the speed of the truck and how it affected the perception and behavior of the victims. Well, I think the answer to that is that this has already been dealt with by the courts in the context of legal causation. We have cases like this that the courts have looked at. The line of cases dealing with... Well, what I mean, give me the predicate facts. Because I didn't get that clearly out of your brief, and I don't feel like fishing for it now in the record. I believe that the plaintiffs introduced expert testimony to support their theory that the plaintiff would have been misled. There's no testimony, of course, as to Ms. Chacon is what she saw because she died in the accident. But there's expert testimony to support their theory that she could have seen that truck, that misjudged its proximity or its rate of its acceleration so as to misguide her as to the propriety or the risk of her entry into the intersection from that stop sign at that point. That's the theory. Now, if she actually testified to that, and she were alive and testified, you wouldn't be here arguing legal causation, would you? Because it would be a jury issue, clearly. I'm not so sure about that. I don't think so. When you look at this line of cases from Hale, Salo, and Kuhl, they look at it from a totally different perspective. They look in terms of who has the prior right on the preferential road. These are all cases that dealt with the same factors that we have here. But none of them negate the impact of the dynamic if, in fact, the speed can be shown to affect judgment if that speed is excessive. Then, in fact, the violation of the speed limit not only becomes a ... is no longer an irrelevant consideration, but can do its job at creating presumptive negligence, which is a term that embraces proximity. Salo v. Singhausen addresses the same thing. Allegations of negligent workout, that the driver failed to slow down, the driver failed negligently to sound the horn, failed to take evasive action. They use, in Salo v. Singhausen, the court says none of that matters. The sole cause is the car coming across the preferential highway. I don't think so. I have Salo here. I don't think Judge Rerich stops with that, with simply that generalized statement. I think he then goes in to analyze to see if that's re-evident or could have been. Poole v. Central, another case now. The facts are five miles over the limit, alleged negligent workout, alleged negligent failure to brake. Same allegations that we have here. The appellate court, again, looks at it in terms of legal causation, who has the prior rights, the principles. Even that court doesn't stop right there, but goes into an analysis ultimately of how it may have, in actuality, impacted on the interaction with the victim, how it could have led to, how it could have contributed to the injury in a foreseeable manner. The focus, of course, is not on what, because it doesn't make sense otherwise to say if you have a preferential highway, you can go as fast as you like and so on, and it's impervious to what impact the driver who is on the preferential road, what impact his conduct may have on the corresponding behavior of the victim. If, for example, he seems to be crawling and the victim enters the intersection and he, in a burst of speed, accelerates beyond the speed limit and hits her, do you mean to say that he gets a pass out of cool or out of salo or out of hip? I don't think so. I think that the cases are clear in saying that the driver on the preferential roadway has the superior right. The question, though, comes down to the one framed by superior is a relative right, but not an absolute right. Much of what Your Honor has been saying has been focusing on the perceptions and mental state of the victim. And that's where I want to get you in your presentation, so we can start measuring out that area, because ultimately I think that's where the resolution of this case may well lie. The question is how speculative can we be in anticipating what goes on in Chaconis's mind if she's not there to testify? What presumptions can we make about what lookout would have revealed the fact that she's entering the intersection or what she could have seen behind the red car? Your Honor, respectfully, I think that's the wrong question. Garland doesn't look to the mental state and perceptions of the victim. It's the foreseeability. It's foreseeability of the defendant driver. And I'd just like to read the Supreme Court's formulation of the issue that we need to look at here. In Garland, the Supreme Court says, the test that should be applied in all proximate cause cases is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's negligence. The question is not what the victim perceived or thought. It's what the defendant driver would reasonably foresee. I don't have a quarrel with that either. It's what the court believes the reasonable driver should have foreseen. Yeah, ultimately. And the courts in Illinois to this point have consistently said the driver in the preferential lane has a right to expect that a car and a signal or a stop sign will stay there and not encroach unless there's actually evidence that the driver saw or should have seen the other car creeping across the lane. The case is relied upon by the lawyer. Well, that's where I want you to focus.  It is an undisputed fact in the case that Ms. Chaconas was stopped at the stop sign when the car in front of her drove around. This is not a roll through. The evidence was that she was stopped at the stop sign. Now, supposing this truck was going at 10 miles an hour. Okay. She stopped at the stop sign. And then she enters the intersection and the truck speeds up without ever having seen her start. Let's say the truck sees her at the stop sign. There is an intervening vehicle or what have you that prevents this truck from seeing her beyond the point where she was at the stop sign. She enters the intersection and that truck turbo jetted, in my hypothesis, and it accelerates to 100 miles an hour without ever having seen this victim's car other than at the stop sign. Does your deferential highway principle carry that truck through? Does that truck have to see the driver start to enter the intersection when he accelerates from 10 miles an hour to 100 miles an hour? Or would that be a factor where we could say that he should have foreseen the possibility of other vehicles misjudging this time of arrival by entering into intersections or what have you so that that sudden acceleration should be considered proximate cause of defendant's injuries? I think you can find certainly attenuated cases. There's a point of the rule. There's a public policy point to the rule, and that is to establish order on the highways. It's the person at the intersecting street who has the burden to make that judgment, to be however careful the person has to be to not make contact with the vehicle in the preferential roadway. But there's no categorical immunity to the driver simply because he's on the preferential roadway. That puts the burden solely on those in the subservient streets to be sure before they enter if they have reason to believe that the truck is going slowly enough. No categorical immunity. You have some other trial errors that you want to address, don't you? Yes. I would just like to emphasize I do believe that Hale, Salo, and McCool do address the specific negligence allegations that we have here. The channel case, to the extent the court gets interested in how quickly the vehicle is moving, that Washington case, channel, is talking about 15 or 16 miles per hour over the limit. And it catalogs a bunch of cases with even faster speeds. The last issue I'd like to pick up on briefly, and I think it's a third and independent reason for reversing the judgments here, is the court's erroneous admission of the prior bad acts evidence. Over objections, the trial court allowed the plaintiffs to introduce testimony that Reeves had been speeding three and five days before the accident. He was going 79.5 miles per hour over the limit. They were allowed to get that in. They were allowed to get in that Reeves had previously been found guilty of falsifying his laws, totally beyond and before this incident. They were allowed to get in. How about your opening statement inviting it by saying this is a good guy? He's a law-abiding guy. By the time the opening statement was made, the court had already ruled that she was going to allow this testimony in. I'd like to cite the pages of that ruling. It's 304 through 307 of the record. I'm not sure that both of the rulings were set forth in the briefs. But in 304 and 307. Isn't that a dangerous thing to say despite the rulings of the court in the opening? Open up this issue or this suggestion you don't want before the jury? To say something like that? We always have that problem. We've confronted, and this is fresh in our minds, we've confronted cases where the court keeps out, let's say, evidence that the defendant, let's say, did a certain act that in the past, let's say in a criminal case he shot somebody. So the prosecutor then gets up, since the evidence was excluded, and says this defendant never shot anybody. Well, you can imagine this doesn't sit very well in anybody's ears, including the judges. It's one thing not to get the evidence. It's another thing to capitalize and fabricate a lie against which the other side is Muslim. You know? Some would call that invited error if the other side decided not to remain Muslim. And that's what I think Justice McBride is alluding to when she says, well, fine, but isn't it a dangerous act to say he's a good guy when he's not? Well, should we say that the plaintiffs at this point can't respond? Well, the rulings had already been made. The defense counsel knew this was poison, that the plaintiffs are going to bring in the fact that you're speeding the court, have law violations, that Alder and Reeves were fined by the federal regulatory agency $10,000. It was argued before opening statement. The trial judge said, I'm letting it all out. It absolutely would poison the jury. The defense counsel tried to diffuse it the best they could. It was a matter of tactics, but it wasn't wavering. The ruling had already been made. And even on appeal, the plaintiffs make the argument that it was okay to bring this stuff in because the fact that Reeves and Alder group did this bad stuff before would logically tell you that they were likely to have done it on the day of the occurrence. And you say there's no theory of negligent fire or failure to supervise it in play here anymore, which would have made that evidence relevant. Correct. Yes. Yes. There was a motion for summary judgment on the agency issue before trials, and that's the posture that went into the trial. The evidence was as bad as it gets. The plaintiffs were able to paint Reeves and Alder group with all this prior conduct and absolutely no effect at all on the occurrence date. This is one of those things where if the rule prohibiting evidence of prior bad acts has any meaning at all, it has to be applied in this case. I would take no more of your time. We're asking for a reversal of the judgment. We don't own the time, counsel, or at least if we do it collectively with everybody else. I will relinquish the floor to Mr. Griffin. Thank you, counsel. At least the court. Hugh Griffin on behalf of Dean Foods Company. Of course, Dean Foods has held into this case solely on a vicarious liability basis, so obviously I endorse wholeheartedly everything Mr. Horstman has argued and briefed. With the court's permission, I would like to go back to one issue since I'm, because of that, I'm involved in it, if I may. Well, let's find out. Excuse me. Well, I think you've dealt with the speed issue. I think you've dealt with it. But I think what you were saying, Your Honor, is well, we had these other theories about you didn't have an adequate lookout, you should have hit the brakes sooner in fatigue. And there was some evidence that the brakes on this truck were not applied until four seconds after the impact. Right. There was a delay based on that. And that's where the relevance of the fatigue issue comes into play. I would submit to you that plaintiffs never proved a cause-and-effect case with respect to those allegations. Their experts dealt solely with the speed. Had the truck not been going as fast as it was, the accident wouldn't have happened. Nobody got up there and said, hey, had they hit the brakes two or three seconds sooner, the accident wouldn't have happened. So I don't think they tried that case. But here are the facts, the only facts on the record on that issue, and this is Mr. Rogers, which was one of their experts, that the Grand Am started to accelerate forward from the stop sign four seconds prior to the impact. Now, you know, there's no duty to hit the brakes until you know that car's stop sign is now coming forward. The other testimony from Mr. Rickard, that was our expert, but their cross-examination of him, and this is volume 23, page 2108, that at night you would expect an alert driver to have a 2.5-second reaction time to the driver making the forward move into your lane. And secondly, at volume 23, 2169, that with a truck, an 80,000-pound truck, when you hit the brakes, you don't get a break right away. It just, it takes mechanics. I think there's some testimony about a second being the ordinary reaction time. I think maybe that's the daylight reaction time, I'm not sure. But the testimony at nighttime, the standard reaction time for night was 2.5 seconds. So my point is, you're down to maybe a second of saying, well, look, if this had been a fully alert driver, if you'd seen her in the very first second she made a move. I mean, there's just nothing but, I mean, I don't think they can even speculate that the action would have not happened. So that's the only point I would make on that, that I just don't think, I just don't think they tried that case. They didn't try that case even from a cause-effect point of view. So now we're back to Dean Foos, and why should Dean Foos be held in this case? I mean, we submit that as a matter of law, it shouldn't be. There's an interesting scenario here, that they never call anybody from Dean Foos. I have a big question, Mark, about what seems to be the main line of your argument, namely that you can't establish agency without the testimony of the principal, that somehow the agent cannot establish his own agency. And I really have a question, Mark, about that, because I'm wondering, at least as I understand that rule, it means you can't create the agency operationally through the mere assertion of the agent. But the agent doesn't lose his status as a witness. I agree. To testify as to any of the acts of the principal establishing the agency or the circumstances from which the agency could be inferred. That's true. And so we don't have any... That line of defense on that point seems to fall away. Well, I think what you're saying is I can't just win this case because they didn't call somebody from Dean Foos. Yes. For purposes of argument, I'll prefer... That sounds a little less contentious. Right. So we don't have any words from Dean... The point is we don't have somebody from Dean Foos to talk about this, because they didn't apparently want somebody to talk about it. So we don't have that. All we have are what the... But you have testimony. We have testimony. You could argue we have some condom. And we're only talking about actual agency. Right. No apparent agency. They sold this case to the jury with all due respect. They're great trial lawyers. Why wouldn't they? I mean, all this apparent agency. I'm not sure where apparent agency comes into play without reliance, without a reliance issue. No, it didn't. I'm just saying there was no apparent agency claim. They're solding it with actual agency. I'm saying they sold it to the jury with Dean Foos' name on the truck. A holding out. Wow, but the name on the truck is a holding out. That's not necessarily actual agency. Absolutely. I mean, I've got my cases. I'm starting back with Foster with a runaway horse cart, you know, with the name of the alleged principal on the cart, and all the way up to Daniels, which is the most recent case by Justice Murphy, yellow cab case, yellow cab all over the cab. I mean, no, that's not enough. So what else did they have? Well, they pretty much established we have a distributor relationship because it says in the handbook they got a distributor prize from Dean. Was there a sharing of profits? There's no evidence to that. How about a manual of conduct that seems to speak on behalf of everyone? Well, to me, what that manual of conduct is saying is when you're out there on the street, people are going to think you're Dean Foos' company, but all the evidence that I highlighted at page 16 and 17 of the brief, I'm not going to read it through. I went on for how many bullets. All the indicia of control and safety and work rules and meetings and impact the driver, anything that impacted how you drove that truck, that all came from ALCO and Alden. In fact, the evidence was, don't forget, that milk is solely the possession of Dean. Dean loves it. Dean prepares the bill of ladings. In their handbook, it says don't even think of grabbing a pint and drinking it. Yes, of course, the distributor is going to get paid for driving the truck, and Dean hopes to make some money on selling the milk, but again, as the cases of Spiegel and Black, I mean, just because you have a distributor relationship, that doesn't automatically create an actual agency. How about the joint venture? I'm sorry? How about the joint venture? Well, there you go. They don't even have a joint interest in the product. There's no evidence that they shared profits and losses. How about sharing expenses on the vehicle? There's nothing about that. I mean, and again, as Daniel said, if you don't have the right of control necessary to create an agency, you need the same right, at least joint right of control. Who paid the withholding tax? Alder did all of it. On the salary of Reeves. Alder? Again, you don't want me to go through all this, but it's all on page 16 and 17. We have it all. It's all. Everything you want to talk about is the kind of things you would look at to decide whether this person is really being controlled by another person in terms of how he's driving that truck. In the case law, again, if the case is, I think your Honor might have been in that Davila case, which was another Yellow Cab case, but Yellow Cab owned that vehicle and reserved the right to terminate the lease for any legal violation or rules of the road. So obviously you can infer they've got a right to control that thing, but they just really never tried it. They just never got to really getting any actual agency evidence in here. Again, it was a great jury case. Dean is referred to throughout in the handbook, but it just isn't there. I would respectfully submit. If you disagree with me there, I think we've got a heck of an interesting limitations issue here. Well, let me get the procedural history. If it was Dean who was in the first complaint, not in the amended, then was there a first or a second? There was a second amended complaint. It comes back in the second. But by the time of the second, the statute had. And the question is whether all of the law that says you've abandoned your earlier pleading if you plead over, whether that's tantamount to disestablishing the fact that there was a naming of this individual, of this company, in the earlier complaint so that you could entertain the notion of inadvertence or otherwise. The question is what really happens? All the cases that speak to the fact that when you plead over, you've abandoned the earlier pleading, they always ask for most things. They never say it's a categorical abandonment or a categorical dismissal. But I don't know. I haven't ever seen an exception, though. I mean, this may be it. I mean, we all know you can't have a pleading stricken and your first complaint, file an amended complaint with no reference to it and then come up and say, you know, I shouldn't have had that stricken. I don't know. It just seems to me, again, you're right. We don't have a case specifically on this point. But I guess certainly the amended complaint, respectfully submitted, is governed. There's two line of cases here. Pruitt and Polizzi, I guess, are the two cases. But, you know, at the time, 616D referred to Pruitt's more than Wilson's case. Yes, it was. And the point he made there was, if you're just talking about you're misidentifying an entity, well, then that's 616D. But you're saying you're looking at somebody else. There is, however, a more, I think, a preliminary question. Because when you talk about misidentifying an entity, what are you misidentifying? Well, are you looking at function? Because if you're looking at function, then 616 will almost apply in anywhere because you mean to get the person responsible for those specific acts. And so if you think it's X when it's really Y, if you meet the other criteria of 616, it will relate back. But I don't think Pruitt says that. Because in Pruitt, the issue is, did you know that the entity that you did join was actually in existence and were you simply mistaken about the notion as to who's responsible? I think in Pruitt it was whether the manager is responsible or the owner is responsible. But if you mean to get the manager, and you join the manager, and the manager turns out to be the wrong entity, then the fact that you then get the owner, it's too late. The statute is rejected. Now, why is this the Pruitt situation and not the police situation where they actually thought they were getting the, what is it, dean food as opposed to... Dean Illinois Dairy. Yeah, Dean Illinois Dairy. And you can certainly say, I think one answer that you have is that they couldn't have made a mistake about the one because they didn't substitute, they added. I'm not sure where that comes from. Let's take it from exactly what they say happened. And that is, they initially sued Reeves and Dean Food. Those were the only two defendants in the original complaint. Then, under their motion, they said we were just advised that the actual owner of the trailer is Dean Illinois Dairy. And then they were also advised that Reeves now is employed by Alder. So you're saying if they knew that there were two or three different entities and they weren't confused as to who was what, but they simply had bad information... They said it was inadvertent. They didn't mean to drop Dean food. That's what they said. They said it was inadvertent. We didn't mean to do a substitute. We didn't mean to substitute one for the other. We just, they could have dropped out and it was inadvertent. And your argument would be that that entitles them to sympathy, not to aversion. Right. You know, 616D changed that in 2002. The question is, how does sympathy, how does the fact that it's inadvertent forestall the result of the brutality of the statute of limitations? Yes, that's the issue. I mean, in the old, you know, the old 616D did talk about inadvertence, but the new one doesn't. And in Pruitt it says, you know, by amending this section, the legislature intended to impose... Make it more severe. Now finally, you know, the ITI instruction on agency doesn't give you the burden of proof. And I think in this case where nobody was called from Dean by reason of the plaintiff's own motions and objections, you know, the jury probably held that against us. And because... I don't think you have to spend time on this. Thank you, sir. Thank you. Good morning, Your Honor. This is Mike Loretta. You're not going to do battle with me for saying that. He's right on that last point. No, sir, I refuse. I'll leave that to Mr. Healy. Thank you. Because if you don't play your long shots, they'll be your short shots, right? I agree. Good morning, Your Honor. This is Michael Racek. I'm here on behalf of part of the plaintiff's affilies, the Chacon's family. Obviously the first topic is the SOJ issue. One thing I wanted to point out, I'm sure the Court is aware of this, but the statute does not tell you what the remedy is. And I wanted to just mention that because it kind of got overlooked as we went through the process. The statute leaves it to the courts to provide the remedy. And the problem, as the Court has put its finger on, is that there's not a whole lot of guidance from the appellate courts as to what to do when you have multiple defendants. Some of them have used up their SOJs, and somebody comes in and has his SOJ allegedly wrongfully denied. Why should the other people be able to jump on that person's bandwagon, so to speak? Well, you know, Justice Myerscough says it's basically because of a kind of an administrative policy not to split the parties apart on the same, basically, clause of action, where you run into the potential of getting conflicting verdicts. And a policy that's always been the case in Illinois, but not a policy that is mandated because we certainly have situations where, for example, I think there's exactly one thing. Unless we say that any judge who sits in a case where he wrongfully denies an SOJ can no longer occupy that chair, period, or whatever it's called. That's the issue. I don't know that if you have the, what they call the shibboleth there, one way or another. I believe that we do, and it hasn't come up. The Bemis, B-E-M-I-S case. Except it was with Trump, wasn't it? Bemis? That was Vacay. Vacay. Correct. The appellate court opinion issued, of course, that they relied upon, and the Supreme Court issued a supervisory order and sent it back to the trial court. And the Supreme Court doesn't discuss this issue, but in the order they sent it back and said it shall stay before the same judge. In other words, the trial court judge had granted a change of venue in that case. That wasn't a wrongful denial of the change. The trial court judge had granted a change of venue, and they certified the question. Yes, and it came up here. Right, exactly. To this panel, or members of this panel. And this court affirmed. But then, of course, the Supreme Court sent the case back down. And to think about the Supreme Court's orders, it said this case shall be tried before the same judge that tries the other two cases. And my point is that the Supreme Court implicitly, in that order, said nobody gets to use an SOJ motion in this case. This case is going before that judge whether you like it or not. That's the Supreme Court order that was recently issued, and it's with our motion that's pending before this court. But, you know, there is a big difference, because that case did not involve the denial of an SOJ. It allowed the entry judge granted the SOJ. But the Supreme Court has effectively overruled that. The Supreme Court, the change, the Supreme Court, what the Supreme Court has done is sent it back down. How does that give us, though, any insight about the subsequent orders of Judge Banks? Because that case proves that there is not, that when the courts have historically said that any order entered after an SOJ is wrongfully denied is void, that is not an absolute guideline. But that wasn't the issue of the case. The issue wasn't whether the trial judge had wrongfully denied an SOJ. I don't know that you can use that case. But the point is that when the court sent it back down, it said, the court reversed it. It said we're not going to allow the SOJ. It's not the case, but it might be something. I'm suggesting that it's guidance to the court that tips the scale in a closed case. The other point is that the Austin D case, of course, is a very unusual case. And our point there, I think, I'd like to just spend a couple seconds on. Well, except that would all be well and good if Myers-Cuff didn't interpose the dissent in the other case as well, and if in Austin D she didn't specifically say that she rejects Steigman's case. She did. I believe she did. She said there were formally rejected Steigman's in Austin D. So she didn't see it that way. What they had before her in Austin D was an unusual situation where we obviously had the state alleging that there was an injurious home environment. And the problem that the court was faced with was that you didn't have two parties. You had the state and you had the child and you had the home and the parents. And there was simply no way that that case was ever going to be settled. So in her opinion, she didn't allow room for Steigman's decision. Correct. She said Justice Steigman is wrong. But she did say what? She said we disagree. Well, she talked about judicial administration. She did disagree. And she talked about Stoler and the other Supreme Court cases that use the generalized language that the opinions of the judgments of that judge are void. Which one could argue commonsensically should only apply as against the party whom her ruling was on. That's right. But she didn't have authority to hear the case. Justice Banks? Yes. Let's assume that Alder was entitled to this SOJ. Correct. Okay. So once she says no, does she have any authority to hear this case? Depends what you mean by the case. She has authority to hear the cases to the parties other than the one that's been settled. Well, that's the question. That's the question. Between Osterich and Osterger. If you trace back this SOJ or change of action, the policy behind it is that when a judge violates, well, at least the statutory provisions here that say, you know, some changes are as of right. And then everyone can always allege prejudice. But the statute here, the automatic as of right. That once the judge violates that statute, that they don't have power to continue hearing the case and that the orders that they enter are null and void. Now, we're at this crossroad. Does it matter that there are these multiple parties or is it truly that the judge, when she wrongfully, if we assume she wrongfully denied the substitution because she hadn't ruled on a substantial issue. Okay. That she doesn't have the power to hear this case. It doesn't matter that there are multiple parties impacted. She doesn't have the power to continue. She doesn't have the statutory authority. And therefore, what she does subsequently, the orders she enters are null and void. That's the heart of the matter here. And the response that we have is that the statute doesn't say that that is the remedy. It's a court-drafted remedy. And if the court's drafting the remedy, then the court should be able to draft the remedy that isn't a bright-line remedy in every situation, that that remedy, in fact, has to be adopted or adapted to the situation, just like they did in Austin D. They adopted the remedy. Obviously, they could not separate those cases apart. There are long-line cases going back more than 100 years when this change is wrongfully denied. Void. Yes. Aren't you basically saying, then, that it's really not a void order? These are all voidable. That's exactly where I was headed. In fact, at first. I want you to give me some cases that really say that, that the other orders are voidable. They're not void. You have all these cases that say, once you wrongfully deny the litigant's right to have a change, either because it was automatic or because there was prejudice, that the orders are voidable, not void. No one has discussed this except Austin D., Osterker, and then whatever guidance we can get from the Venus case. All of the cases that have used the word void have not used it in this scenario. You have a scenario here where the other parties have not been offended or aggrieved or injured by the fact that all their group's motion was not granted. We'd have the same scenario, and I think I used this in my brief. The concern behind this is that we don't want inconsistent verdicts. That's always been a goal of the court. But that's a goal. That is not a right-line test. That's not the driving force. That's the rationale. The driving force is the general language that the Supreme Court uses, that what the court does after failing to grant an SOJ is a nullity. It doesn't make distinctions or draw fine lines. The fine lines are being drawn by Steinem, and there's a lot of good sense in the fine lines he's drawing. But Meyerstuff comes along and says, there are policy reasons why we shouldn't honor them. And that policy reason is an inconsistent verdict. And yet an inconsistent verdict can happen in any situation where one defendant makes objections to some evidence and the other defendants don't join him. If that case goes up on appeal, that one defendant will get a reversal but not the others, and you could have an inconsistent verdict. Inconsistent verdicts can result in this world. Inconsistent verdicts can come up in a number of scenarios. Well, what this would do, if in fact it was clear that Meyerstuff is right, it would make the plaintiffs' policemen to make sure that the judge doesn't screw up in plain language in granting the SOJ by joining in the motion. You'd almost have to never, ever raise the scenario. You never would challenge it for fear you'd end up with just this scenario. Right. Again, I have to go back. If you look at the Bemis case, the Supreme Court of Bemis has said, no changes. They sent it back down. They reversed the change. They sent it back down for a trial before the same judge. By doing that, isn't the Supreme Court saying, you're right, this absolute right is not absolute. Well, actually, the Supreme Court has reminded some of us that there are supervisory orders. Yes, sir.  And we can't take anything from what they have said. We can't take anything from that. We can't. We can't, but human nature being what it is, I think that everyone can. It reminds us in writing. Well, I'm not sure that we can. It at least tells us that we need to. They construed a rule in such a way to make it appear, as we said, it's not absolute, just as Justice Feigman said it was. Is the substantial argument something that is really a backup? The two backups that we have are either that when the judge, I understand it's an agreed order, but when Judge Banks vacated the order of such... Granting. She granted that one, right? Correct. She vacated her order so that she would have the case back before her. That was a substantial ruling because it is a step in the process, and our position is quite simple. Who judges the case is a step in reaching the merits. That's what Bonnie Owen and the case right underneath Bonnie Owen that we cited said when they're talking about subpoenas and depositions. Is the granting of a substitution, is there any case you have that says that that's a substantial? No. Either way, that was Mr. Horstman's point. Our point is there isn't anything that says it's the other way. If it wasn't... If it wasn't a substantial ruling, what would you rely on to help us get to that? Bonnie Owen and the case under it. They said it's a substantial ruling when you cause somebody to appear before a deposition. They said it was a substantial ruling when the trial court, in fact, entered an order approving a stipulation. That would be the Roach case. They said those were substantial rulings. What makes this substantial then? The granting of an application. Or the vacation of it. This would be the vacation. It's the reconsideration of the grant. I just want to make sure I'm on the same page. Because it determines who hears the case. And if it wasn't important, why are we here? I hate to fall back on the simplicity, but simple thoughts are good ones. We're here because they think it's important. It is a substantial issue. It's not some minor issue that's just shoved to the side. We wouldn't be here. We wouldn't be having this argument. The final point is, and one that the trial court... We're here because there's a substantial number of issues. It's a significant case that all the lawyers spent so much time on. And it could turn on how this SOJ was handled by the lawyers in the trial court. Absolutely. I agree. It would be extremely significant to undo all the work that was done because of this denial of the substitution of judge. A denial that did not in any way impact the other defendants. You also aren't because Alder isn't entitled to that SOJ, right? The last line of attack on it is, in fact, that... But you don't deny that it's an independent corporation. We've never proved. We did not do it. And, again, I go back to, is the automatic change of venue statute so absolute that when two people stand in court and say, if we're one, do you get one change or two changes? Was that unreasonable for the trial court judge at that point? Was it wrong for the trial court judge at that point to say, you are one? The statute says parties. They said parties. There's no doubt that the statute says parties. That argument is not one of your better ones. I prefer my other two arguments. I do. It stands. It's there. It's not the one you would put in the bank. No. No. Nor do I expect it to be the one... Well, I'm not going to say it. This court is going to write the opinion as it writes it. I'm aware of that. If I can, unless the court has further questions, I understand you're here a long time. As to the causation, the question of whether or not we proved legal causation, the scenario, the facts about the accident that show that implicate legal causation are that Christina was at the stop sign, and as counsel says, we know she stopped, so we know she's in exercise of due care there. We know she can see the truck, so that we know when she pulls out, she's not pulling out blindly. She can, in fact, see the truck. That's their argument. We know that she waited for the car in front, a little pickup truck. If this car were going at 40 miles instead of 49.5 miles, it's clear that she would have avoided it? No problem. And she waited for the truck to make the left turn in front of the defendant truck, the little pickup. She waited for that. She waited until Mr. Christian. Where does your 30% or 40% contributory that you admitted to come into play? Because at that point, under the statute, she has to make a judgment as to whether or not she, in fact, has time to clear. Or is the truck so imminent, is the hazard so imminent that she should not pull into the intersection? That's a judgment call, and the jury is going to grade that from 0 to 100. And obviously, they stopped at 40% for us and said it is partially our fault. But it doesn't mean it's all or nothing. Isn't the 40% like being a little bit pregnant on all of these cases that talk about the rights of the user of the preferential highway? I mean, can't she be partially negligent here without taking it all and giving the day, so to speak, to the user of the preferential highway? I'm not sure why the court would have to come to the conclusion that it's either the truck driver who was 100% at fault or the other driver who was 100% at fault. Because of the cases that say that the violations of the driver, the speed of the driver, is not going to be considered in determining the proximate cause. But that would be a correct statement of the law under the facts that we have here where she could see the truck and where we have the careful habits testimony, which is enough to have the jury say she must have broken justice. That wasn't discussed earlier, but why should you have careful habits testimony? Even if we adopt Federal Rule 406, how could that possibly apply where you admit contributory negligence? How can you ask the jury to presume that she was free of negligence based on her past practices, that she's a safe and careful driver, when you admit in this case that she's not? Because that's not the issue. That's not the question the jury has to resolve. I'm perspective, just to agree with the court on that. The careful habits testimony takes the place of the situation where Christina would have survived and been able to say what she did. That's all it did. So if we assume that this is an intersection action where both parties can testify, I don't understand what the problem is. But once you admit that she was not a safe driver, where's the presumption? You're making another presumption, that she is generally safe, except where she isn't. No, we're making... No, so you would be saying she's 40% unsafe, but for the rest presume she's safe. It's just an oxymoron. I mean, it's hard to logically reconcile that presumption under 406 with the fact that you admit her culpability. Partial culpability. So where does that presumption apply? The presumption allows the jury to decide that Christina acted with due care. Whether she acted with sufficient due care is the question that they had to resolve. She did act with due care, as you would do in any accident. I think at this point we're beginning to get a little more metaphysical than in my mind. In any scenario, if your honor is correct, then in any scenario where one party or the other admits I was somewhat at fault, the case is over. Because your honor would say, well, if you're at fault, you're entirely at fault. And that's not the case. It's a question of balancing the faults between the two drivers that are there. And that's what the jury did. But you can't make a presumption anymore or an inference of due care where that inference is negated by the admission. I guess that's why I'm not – I don't understand why – and I'm not willing to say it was an admission. It was not a legal admission. We stood in front of the jury in closing arguments and said, we understand that you would be able to point to the drivers not having exercised complete due care, but nobody has suggested in this case that this is a bursting bubble presumption. I think that's where your honor is headed. It's a bursting bubble presumption as soon as there is any evidence of lack of due care, it disappears. If she had testified, I understand. I thought I had time. Would the court then say that if plaintiff's counsel at trial admitted that her judgment was a little bit off, that she could no longer win the case? No. Did she get the instruction that she was presumptively exercising? Correct. This care? Correct. Does she? You're saying she does. After she says, I thought I had enough time. Well, then the careful habits don't come into play because you have the right witness. I think that's what we're trying to get at. Why did the careful habits come into play? To show that she was a person of careful habits. Illinois originally rejected careful habits when there was any eyewitness testimony. Correct. It made a lot of sense. Because it's a kind of inference. It's like a universal solvent. It gives a little more help than is traditionally allocated to a person. To be able to rely on generalized presumptions instead of specific evidence in meeting your burden of proof. So it was a rule of necessity. So that you're not entirely out of the box simply because you don't have an eyewitness. But where you do have an eyewitness, that rule of necessity falters, and there was a good rationale for saying, under those circumstances, no presumption will be made. But I'm not retreating from that. The notes under the instructions say it does apply in this scenario because we don't have testimonies to exactly where she looked and what she did as she made the turn. But if Your Honor is correct, then any scenario in which a party agreed they might have been partially at fault would end their ability to defend or prosecute the case depending on what side they were on. And that's the rationale that I'm struggling with. Well, they might very well. I'm beginning to doubt or rethink whether under the facts of this case there was really any kind of admission. But if there is an admission of fault, it destroys the predicate for the presumption. But then Your Honor is saying the presumption would fall in its entirety. Yeah, because there's no predicate for it anymore. You can't presume due care in the face of a denial of due care. That's a bursting bubble presumption. I don't believe, and it's not a defense to the jury instruction that was raised in the trial court, so I've not had the opportunity to face it. I don't believe. I convey a firmer position than I intended to. I'm rethinking in my own mind whether we have that kind of admission. What we had here was a closing argument where, given the allegations of case, I think Counsel Weiss has said it, it's not necessarily true that we're virgin pure in this regard. We don't have an answer. That would move to the point of a judicial admission. And because we didn't address this issue in the briefs on either side, you do get to the point where a judicial admission has to be an admission of a fact. Well, I don't think neither judicial admission to it, because a judicial admission invokes a kind of an establishment. All we need is an evidentiary admission. And then the question would be to just rise above it. Because if we have an evidentiary admission, by the partisan case. Your Honor would say then that this jury had to find zero comparative default. As soon as they found any comparative default on the part of Christina, she had to lose the case. No. And that the truck driver had to win the case. That's really where we're headed. Well, I have to think about that. I have to think whether it's inconsistent. If a jury really relies on the presumption, and that is the sole basis of its verdict, then giving a verdict of contributory negligence may not make sense, may not be reconcilable. But that may not be the sole basis for their verdict. They may have a lot of other data of factual predicates to rely on. That's why I started out with my description, as Your Honor, as Mr. Horstman, of the scene of the accident. If we don't have that assumption, that inference, we do have the circumstances suggesting to the jury that she acted carefully in every other regard at that moment. By stopping, by waiting, by not pulling out until Mr. Christian had cleared. By accelerating normally. That's just a testimony. Not quickly. She moved normally to the middle of the intersection. And she had every reason to believe that the truck was going to stop. The problem is, of course, that all of that is being made through a kind of an inductive leap, with no witnesses along the way or circumstantial indicators of what she did or didn't do at any given moment. So there's a blank line here drawn between two points without intermediate support. And the question is, does that hold up? I would disagree, because that's what circumstantial evidence is all about. There's always a blank spot between A, B, and D. There's too much speculation. That's what I'm saying. In a scenario like this, with those particular facts, I'm not aware of another case. Nobody's cited a case precisely at this point that has these facts that would let you infer or deduce that that driver, in fact, was exercising due care. If there had been anything in there that was otherwise, that might be a different case. But she did everything. We know she did everything correct. The only thing she didn't arguably do correct was she should have waited a little bit longer. And the jury said she wasn't totally at fault, that she was misled by the other party, by the other party's speed. That's our point, obviously. When you look down the road, you assume that the other party is going a certain speed. If somebody's going very, very fast, when you walk across the street and look down the road, assume you're jaywalking. You're not supposed to. Assume you're jaywalking. When you look down the street and you don't cross, you see somebody's coming up quick. That's what Goldman said. Goldman actually provides a little bit of the bridge, if you honor. Goldman actually has a phrase in it that the party will, in fact, look through traffic and not move until they think it's safe. Unless the court's going to say somebody was suicidal, given all the facts, that she had no mistake about what was going on. We know that. They said she could see it. To say that a person would drive out in front of a truck, it's almost saying that, as a matter of law, they were trying to kill themselves. It gets that bad. I mean, there is a presumption that we think that you don't. I know there's a presumption you don't do that. So my point is that that point is not as clear, I think, as at least what your Honor would suggest. This is where there's enough supporting evidence to warrant that kind of inference by the jury. But if the court was not willing to accept the inference that was given to us by the instruction, precisely. Unless the court has further questions, we've been here a long time. I think I've answered the long questions in the brief fairly accurately or adequately. We've discussed it a lot. All the briefs were up to the usual excellent standards of all the parties. We're very helpful. Is there going to be anything else? Yes. Mr. Z has the rebuttal on the Dean Ford's issues. Thank you, Your Honor. Not a lot, but I did want to comment on a couple of things that have been said. Basically on the issue of agency, one of the themes in the brief was that we couldn't prove our case just with an agent. And I think that's been worked out, the court has, in discussion with Mr. Griffin. Well, the question is whether you have enough proof from anybody, agent or otherwise, to establish agency as opposed to establishing that there were business relationships. Correct, Your Honor. Correct. And that's our point, I think, really. And just with a little bit of background, to understand those two businesses and the relationship between the businesses, between Alco, Balder, and Dean. They had multiple locations that were joint, both in Illinois and Wisconsin. And that's characterized as a distributorship, which is not an agency necessarily. That's correct, Your Honor. That's correct. It isn't a distributorship. It distributes certain products just exclusively for Dean. Exclusively for Dean. That's a relationship that goes back 60-some years. At any rate, if we start out with the context that there is this multiple locations with both of them at each location. We have a manual that was given out by Alder that was admitted into the case. It was given to every driver. And despite the fact that it was called the Alder Driver's Manual. Would you have to keep in mind the Davila case while you're talking about that? Yes. In this case, it was addressed as the Alder Dean Manual, without objection by the experts. And there's good reason for that. On the first page of the manual, the manual talks in terms of through your actions, second sentence, through your actions and from your appearance, these people will form an opinion of Dean Foods. Dean Foods is right up front. Your job in the manual, your job and the future of Alder's and Dean's Foods Company depends largely on your performance. I think more important than the content of that instruction is the question of whose instruction is it? Where does the instruction come from? Does it come from Dean or does it come from Alder? Correct, Your Honor. And the point is, because of these extraneous facts, then I think we begin to understand that, in fact, this manual is coming from Dean's. As well as from Alder, obviously. But they are together in this. And these are statements that are made in this manual while the attorney for Dean, president of the courtroom, obviously, and no rebuttal to any of these issues. It goes on. And I'll just be very brief about it. It says, keep smiling and driving with continuing pride in the job you perform as part of the blue and white Dean fleet. And the court is correct. If this were Alder and Alder was doing this without Dean's knowledge, then we have a problem. That's not the case. We have a relationship that goes back 68 years. We have both corporations at a single location. Yeah, okay. I don't think we want to spend a lot of time at this point. But the fact of the matter is, if you're a distributor of a product, your inventory is the name of the product when you're dealing with brand name distributions. So all of these instructions are certainly as beneficial, if not more so, to Alder as a distributor than they are necessarily of Dean. So the question is, even if they substantively have enough weight to give, to convey, to constitute sufficient control, then the question is, who is behind that instruction? If there is sufficient control, and I think we'll get an argument about that. But in point of fact, under these circumstances, the conveyor of those instructions are the distributors who have a strong stake in each one of those instructions. Because that's the product they're selling. That's correct, Your Honor, as does Dean. And Dean has a strong interest in every one of those instructions. Is Dean's involvement under these facts speculative? Even though it has an interest, do we have enough to show that Dean in actuality is imposing that instruction? Well, you know what, that's the question. I'm not answering that. Only, if probably, Your Honor, and I won't go through a lot of it, but one good summary statement by one of the witnesses, the key witness, the driver of the truck, Mr. Reeves, states, I am a representative of Dean. So he summarizes. He knows about the locations. He knows about the manual. He knows about the direction he's got. He knows about the pressure that's put on him by Dean. And the other critical thing, Your Honor, the other critical document in this case, is the stationary that the older people use when they're communicating with the drivers, when they're disciplining the drivers. They use Dean Foote's stationary. That's how they communicate with these drivers. These drivers believe, as was stated by the driver in this case, that he is an agent, a representative of Dean Foote. Well, that addresses the parent authority more so than it does actually, which is, again, something that your opponent says you're not arguing with the parent authority. We're not, Your Honor. You're right. We're not. Although, once again, Your Honor, if insignias are an indicia, though, of control, because Dean has an interest, and Dean wants to control that driver, that older driver, at all times. He wanted to control him at the time of his impact. And there was no question about that. So the logo on there says to the driver, if I don't do everything right, if I speed, if I am fatigued, if I'm falling asleep at the wheel, I'm going to get in trouble with Dean, because Dean has already told me, you represent us out there. And for everyone that sees what we're doing, who pays their salary? All do this. Is there anything more? Oh. Your Honor, there were a couple of other things discussed, and I don't know if the relation back, I don't want to hear anything more. Pretty much, Your Honor, why don't we say how much time will you need? Your Honor, I don't want to artificially make you stop. If you can tell us you need four or five minutes to summarize, we'll let you go. That would be fine, Your Honor, four or five minutes. In this case, Your Honor, I don't think there's any question that there is a 6-1-6 relation back. The original defendant, Dean, which is the critical issue, was sued before the statute. It was only based on information that we got from the defendant that made us amend the complaint to bring in Dean in Illinois Dairies. They were served. They had filed an appearance. Dean had. They were involved in the consolidated case from day one all the way to the end. During the course of litigation, as we got closer, Dean Food filed a summary judgment against us. Dean Food did. During the course of it, right before trial, another firm came in for Dean Food, filed an additional appearance for Dean Food. Is part of their summary judgment an agency defense, a defense that they were not principals there? Yes. Yes, but an additional law firm came in and filed an additional appearance for Dean in our case. The Haines firm, after that firm, the Donahue firm, withdrew. Haines firm came in and filed another appearance for Dean. Before this issue ever came about, before we ever filed the second amendment, they were in the case, Your Honor. Yeah, if you want to give us a little bonus by stopping it for three minutes. You know what, Judge? We'll gladly accept it. Judge, let me just say the egregious conduct of the driver in this case is what really drove the liability. We have an automobile in an intersection for five seconds. We have the driver not seeing it. We have a truck that pushes that vehicle farther than the football field and doesn't put the brakes on for four seconds. Based on that, Your Honor, there's no question that the conduct of the driver in this case drove that liability. This wasn't a perfect case, a perfect trial. It was a three-week trial, like all cases of complexity. No one gets a perfect trial, but they got a fair trial, Your Honor, and we believe it should be affirmed. Thank you. Very short rebuttal, Mr. Griffin. Oh, I'm sorry, Mr. Horst. You got both rebuts or just one? One minute. I'll wait a moment. All right. One minute or two, right? Three points, very briefly. Mr. Rancek is arguing that now the subsequent orders are not always void after an improper ruling, after a change of judge motion. He's also talked about how the remedy is a court-made remedy, suggesting that this court should change what the Supreme Court has already set forth. Any change in the law should come from the Supreme Court. Dominant F is the law that should guide this court. With respect to DEMAS, Your Honor, Justice McGrath has pointed out, supervisory order is not precedential, especially this one. This didn't have any content, no explanation as to why the Supreme Court vacated it. The third point with respect to the careful habits instruction, there were crystal clear admissions in the closing arguments of the plaintiffs. They admitted and specifically invited the jury to sign. Ms. Chaconis is 25 years old. Are you sure there wasn't an admission, because I haven't checked the record on that, because ordinarily, in closing arguments, you kind of cover your flanks by saying, we don't think that there was any negligence here. But if you do, it couldn't be more than that. Now, is that an admission? I think there are clear admissions there. Did they say, yes, my client was negligent, but only so much? Or did they say, she wasn't, but if you think she wasn't, it couldn't have been more than that? Because isn't that the way it generally goes? We've cited the pages of page 42 of our brief. All right. Thank you. Very quickly, Your Honors, just on that agency point about the testimony of Reeves, that he was a representative of Dean, what he said was that he would appear, the question was, how would it appear to the public that he would be a representative of Dean? Again, what he also said was, nobody from Dean ever told him how to do his work. And we have the cases, Daniels, Traska, Foster, where the name of the prospective or the alleged principal was on the truck. I mean, every case where your name's on the truck, the driver's conduct will, to the public, reflect on that company, but that does not prove actual agency. Thank you, Counselor. Gentlemen, thank you very much. The arguments were great. The briefs were great. The problems to be solved are great.